1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11 | THE RIDGE AT RIVERVIEW
HOMEOWNER'S ASSOCIATION,

CASE NO. 21-CV-00950-LK

12 | Plaintiff,

ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

13 | v.

14 | COUNTRY CASUALTY INSURANCE
COMPANY,

15 | Defendant.

16

17    This case involves a coverage dispute between Plaintiff The Ridge at Riverview

18 Homeowner's Association and Country Casualty Insurance Company.[1] The Association seeks

19 summary judgment on aspects of its claims and on Country Casualty's affirmative defenses. Dkt.

20 No. 27. The Court grants in part and denies in part the motion for the reasons discussed below.[2]

21

22

---

[1] The parties stipulated to dismissal of the Association's claims against a second defendant, Fireman's Fund Insurance
Company, on December 29, 2022. Dkt. No. 40.

[2] The Association requests oral argument. Dkt. No. 27 at 1. Given the outcome here, however, the Court finds oral
argument unnecessary.

# I.     BACKGROUND

Built in 2000, The Ridge at Riverview Condominium Complex is a series of 18 wood-framed residential buildings in Kent. Dkt. No. 29-1 at 6; Dkt. No. 14 at 2. The Association was formed "to maintain the common elements and any limited common elements of [the complex] for the common enjoyment of the unit owners." Dkt. No. 14 at 2. Relevant here are three all-risk insurance policies that Country Casualty issued to the Association. *Id.* These materially identical policies, which were effective for a combined total of three years between November 2017 and November 2020, insured against "direct physical loss of or damage to" the condominium buildings "caused by or resulting from any Covered Cause of Loss." Dkt. No. 28-1 at 196; *see* Dkt. No. 28 at 3 ("All three years of Country [Casualty]'s coverage . . . use the same policy language.").

The Claim

The Association retained Kris Eggert of Evolution Architecture to inspect the condominium buildings in response to concerns about possible hidden water damage to several decks. The Association received his report in March 2020. Dkt. No. 29 at 2; Dkt. No. 31 at 2. With help from McLeod Construction, Evolution performed an "intrusive investigation"—a procedure that entailed cutting nine openings in several of the buildings' exteriors to test for water damage. Dkt. No. 29 at 2. Six of the nine openings revealed "hidden water damage to underlying building components[.]" *Id.*; *see* Dkt. No. 29-1 at 7–8, 10–11, 14–22 (documenting water damage). Counsel for the Association immediately wrote Country Casualty to formally submit a claim for the hidden water damage. *See* Dkt. No. 31-1 at 22–24. In addition to enclosing a copy of Evolution's March 2020 inspection report, counsel expressed his belief that the 2017–2020 Country Casualty policies "cover the cost of repairing any hidden water damage to building paper, sheathing and/or framing at The Ridge," and requested that Country Casualty "investigate, identify, and pay the cost to repair any such covered hidden water damage." *Id.* at 23. The parties thereafter agreed to toll the policy's

suit limitation clause and any applicable statute of limitation until November 2021 so that Country Casualty could complete its investigation of the claim. *Id.* at 125–26 ("[A] suit filed by the Association against Country Casualty within twenty days of actual termination of this agreement . . . shall be treated as if it had been filed on March 27, 2020."); *see also* Dkt. No. 28-1 at 188.

Evolution, McLeod Construction, and Degenkolb Engineers (on behalf of Country Casualty) participated in a multi-day, joint intrusive investigation of the condominiums in June 2020. Dkt. No. 29 at 2; Dkt. No. 29-1 at 27; Dkt. No. 31-1 at 107. This time, however, they cut 31 openings. Dkt. No. 29 at 2. And this time, 20 of the 31 openings revealed water damage "hidden behind siding and soffits and other parts of the building envelope[.]" *Id.* at 2–3. Eggert authored a lengthy report documenting these findings in July 2020. *See* Dkt. No. 29-1 at 25–103. He opined that "water intrusion in the form of rainwater events, including wind-driven rain, is the primary cause of the hidden water damage identified at Ridge at Riverview." *Id.* at 27. Eggert also set forth three "secondary causal factors" that contributed to the damage: "[l]ack of adequate flashing"; "[i]mproper flashing and weather resistive barrier installation"; and "[s]iding and sheathing installed in close proximity to concrete hardscape." *Id.* As for the origins and timing of the damage, Eggert found that it had "occurred incrementally and progressively each year from 2000." *Id.* The Association provided this report to Country Casualty in August 2020. Dkt. No. 28-1 at 189.

<u>Country Casualty Denies Coverage</u>

Fifteen months passed. Then, in November 2021, Country Casualty issued a formal letter denying coverage of the Association's claim. *See* Dkt. No. 31-1 at 106–122 (denial letter); Dkt. No. 28-1 at 191 (claim notes indicating denial letter was issued). In setting forth its reasons for denying coverage, Country Casualty traced the 20-year history of the condominiums and identified several past problems with the buildings' exteriors, deck deterioration, column leaks, and delayed maintenance. Dkt. No. 31-1 at 106–07. A review of the records, according to Country Casualty,

showed "that the Association ha[d] previously experienced issues similar to those identified in the 2020 Evolution report." *Id.* at 106. It also itemized its interpretation of the damage uncovered during the June 2020 joint intrusive investigation. *Id.* at 107–08. As relevant here, Country Casualty determined that "[n]ormal and expected precipitation was allowed to enter the building and contact moisture sensitive building materials on multiple occasions as a result of the failure to construct and maintain the building envelope in a more moisture-resistant condition." *Id.* at 107. Inadequate construction and maintenance of the exterior vinyl cladding, painted wood trim, and deck flashing/coating systems "allowed periodic moisture contact and/or sustained elevated moisture levels within the building assemblies[.]" *Id.* This in turn "caused localized deterioration of the [gypsum board], fungal decay of wood framing materials, and corrosion to fasteners and structural hardware at multiple locations." *Id.*

After reprinting 13 pages of policy language that "may be applicable" to the Association's claim, *see id.* at 108–121, Country Casualty indicated that it "was unable to identify any loss or damage that commenced during the policy periods" because the identified damage "appear[s] to have existed for years and there is no reason to conclude that any particular issue has begun, or even changed appreciably[,] during the three policy years." *Id.* at 121. Country Casualty also relied on Section A.2 of the Washington Changes endorsement. In its view, the claimed damage is excluded from coverage because it is "either caused solely by or [is] part of a sequence of events initiated by" one or more excluded perils—namely, "[w]ear and tear, decay, deterioration"; "[c]ontinuous or repeated seepage or leakage of water, or the presence of condensation"; and "[f]aulty, inadequate or defective design, workmanship, repair, construction, renovation, materials, or maintenance." *Id.* Nor did Evolution's report identifying wind-driven rain as the primary cause of the damage alter Country Casualty's coverage decision. *Id.* As it sees things, weather conditions (such as rain) are not the primary cause of the damage—"[t]he primary cause is instead the reason

the walls fail to withstand ordinary background climate conditions." *Id.* at 121–22. Country Casualty concluded by observing that, to the extent rainwater did cause the claimed damage, the damage "may not be covered because there is no covered cause of loss that allowed the rain to enter the wall structure." *Id.* at 122.

In his October 2021 report, Degenkolb structural engineer Michael Bramhall likewise attributed the water damage to faulty construction and maintenance. He concluded that "[n]ormal and expected precipitation was allowed to . . . contact moisture sensitive building materials on multiple occasions as a result of the failure to construct and maintain the building envelope in a more moisture-resistant condition." Dkt. No. 28-1 at 77. More specifically, moisture has penetrated the exterior at "failed sealant joints, at penetrations in the cladding, at changes of plane, and at changes of material." *Id.* Bramhall further opined that inadequate construction and maintenance of the vinyl cladding, wood trim, and deck flashing/coating systems "allowed periodic moisture contact and/or sustained elevated moisture levels within the building assemblies[.]" *Id.* at 78. This caused "localized deterioration of the [gypsum board], fungal decay of wood framing materials, and corrosion to fasteners and structural hardware at multiple locations." *Id.*

<u>This Lawsuit</u>

The Association sued Country Casualty in federal district court seven days after receiving the coverage denial letter. Dkt. No. 14.[3] In its First Amended Complaint, the Association seeks a declaratory judgment that Country Casualty's policies cover the damage and cost of repairs. Dkt. No. 14 at 10–11. It also advances claims for bad faith, breach of contract, violations of Washington's Consumer Protection Act, and negligence. *Id.* at 11–16. Country Casualty asserts

---

[3] To be precise, the Association named Country Casualty as a defendant in a First Amended Complaint filed on November 22, 2021. *See generally* Dkt. No. 14. The Association had already sued Fireman's Fund in July 2021 and, at that time, Fireman's Fund was the only named defendant. *See* Dkt. No. 1 at 1.

1    six affirmative defenses: the Association's action may be barred (1) by the policies' suit limitation

2    condition; (2) by one or more exclusions; (3) by the "known loss" doctrine or lack of any fortuitous

3    loss; (4) by the policies' commencement provision; (5) because the Association failed to mitigate

4    its damages; and (6) because the claimed losses do not exceed the policies' deductible. Dkt. No.

5    19 at 5.

6                                    **II.    DISCUSSION**

7            The Association moves for summary judgment on several issues. It asks the Court

8    to dismiss Country Casualty's affirmative defenses and declare that (1) the policies cover weather

9    conditions; (2) the policies cover damage from a combination of weather conditions and negligent

10   work, even if negligent work was the initiating cause of the damage; (3) no other policy exclusions

11   bar coverage; and (4) if the jury finds damage from the combination of weather conditions and

12   negligent work, Country Casualty is jointly and severally liable for all incremental hidden water

13   damage because some new damage occurred during the three years of Country Casualty's

14   coverage. Dkt. No. 27 at 4–5.

15   **A.    Jurisdiction**

16          This court has jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the

17   amount in controversy exceeds $75,000. *See* Dkt. No. 14 at 2–3; Dkt. No. 40 at 3–4.[4]

18

19   ───────────
     [4] Federal courts are presumed to lack subject matter jurisdiction, and the plaintiff bears the burden of establishing it.
20   *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). In its complaint, the Association asserted that the
     parties are diverse but did not allege the location of either defendant's principal place of business. Dkt. No. 14 at 2–
     3; *see also* Dkt. No. 17 at 2 (denying that the Court had subject matter jurisdiction); 28 U.S.C. § 1332(c)(1) (for
21   diversity purposes, a corporation is a citizen of (1) the state where its principal place of business is located, and (2)
     the state in which it is incorporated). When it is "unclear where the . . . defendant corporations have their principal
22   place of business, it is uncertain whether there is actually diversity of citizenship." *Toll CA, L.P. v. Am. Safety Indem.
     Co.*, No. 16CV1523 BTM(RBB), 2016 WL 10907093, at *1 (S.D. Cal. June 27, 2016). To fulfill its duty to
     independently determine subject matter jurisdiction, *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010), the Court ordered
23   the Association to show cause why this case should not be dismissed for lack of jurisdiction. Dkt. No. 37. The
     Association then sufficiently alleged diversity. *See* Dkt. No. 14 at 2 (Association is incorporated in, and has its
24   principal place of business in, Washington state); Dkt. No. 40 at 3–4 (alleging that Country Casualty is incorporated
     in, and has its principal place of business in, Illinois, and that Fireman's Fund is incorporated in California and has its
     principal place of business in either California or Illinois).

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT - 6

1    **B.     Legal Standard**

2         Summary judgment is appropriate only when "the movant shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4    Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

5    stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

6    evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

7    sided that one party must prevail as a matter of law." *Id.* at 251–52. To the extent the Court resolves

8    factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts

9    specifically averred by that party contradict facts specifically averred by the movant, the motion

10   must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

11        The Court will enter summary judgment "against a party who fails to make a showing

12   sufficient to establish the existence of an element essential to that party's case, and on which that

13   party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

14   When a defendant has the burden of proof on its affirmative defenses at trial, a plaintiff moving

15   for summary judgment on the affirmative defenses need only show that the defendant does not

16   have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.

17   *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also*

18   *Celotex*, 477 U.S. at 322–23. Once the moving party has carried its burden under Rule 56(c), "the

19   nonmoving party must come forward with 'specific facts showing that there is a genuine issue for

20   trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting

21   Fed. R. Civ. P. 56(e)) (emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are

22   conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour

23   the record in search of a genuine issue of triable fact"; rather, the nonmoving party must "identify

24   with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT - 7

1    F.3d 1275, 1279 (9th Cir. 1996) (cleaned up).

2    **C.    Contract Interpretation, All-Risk Insurance Policies, and Exclusions**

3              "The criteria for interpreting insurance contracts in Washington are well settled." *Quadrant*

4    *Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005). The "primary goal" is to ascertain

5    and give effect to the parties' intent at the time of the policy's execution—not "the interpretations

6    the parties are advocating at the time of the litigation." *Int'l Marine Underwriters v. ABCD Marine,*

7    *LLC*, 313 P.3d 395, 399–400 (Wash. 2013). In doing so, the Court "construe[s the] insurance

8    polic[y] as a whole and give[s] the language a fair, reasonable, and sensible construction as would

9    be given to the contract by the average person purchasing insurance." *Seattle Tunnel Partners v.*

10   *Great Lakes Reinsurance (UK) PLC*, 516 P.3d 796, 800 (Wash. 2022) (cleaned up); *Certification*

11   *from U.S. Dist. Ct. ex rel. W. Dist. of Wash. (Kroeber) v. GEICO Ins. Co.*, 366 P.3d 1237, 1239

12   (Wash. 2016) ("This court views an insurance contract in its entirety, does not interpret a phrase

13   in isolation, and gives effect to each provision."). Undefined terms are thus given "their popular

14   and ordinary meaning[.]" *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 601 (Wash. 2016). But

15   when the policy expressly defines a term, the Court is bound by that definition. *Overton v. Consol.*

16   *Ins. Co.*, 38 P.3d 322, 327 (Wash. 2002).

17             Ambiguities in the policy are strictly construed against the insurer. *Findlay v. United Pac.*

18   *Ins. Co.*, 917 P.2d 116, 119 (Wash. 1996). When determining whether ambiguity exists, the

19   Court—as is the case generally—views the policy language as it would be read by the average

20   insurance purchaser. *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246–47 (Wash. 1997). The

21   Washington Supreme Court has repeatedly emphasized that policy language is ambiguous only

22   "if, on its face, it is fairly susceptible to two different but reasonable interpretations." *Seattle*

23   *Tunnel Partners*, 516 P.3d at 800. Where, however, the policy language "is clear and

24   unambiguous, the court must enforce it as written and may not modify the contract or create

1    ambiguity where none exists." *Transcon. Ins. Co. v. Wash. Pub. Utilities Dists.' Util. Sys.*, 760

2    P.2d 337, 340 (Wash. 1988).

3         Determining whether coverage exists under a policy is a two-step process. *McDonald v.*

4    *State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003 (Wash. 1992). First, the insured bears the burden

5    of showing that its loss falls within the scope of the policy's insured losses. *Id.* at 1003–04. If such

6    a showing is made, the insurer can avoid coverage only by showing that "the loss is excluded by

7    specific policy language." *Id.* at 1004. This inquiry requires the Court to characterize the perils

8    contributing to the claimed loss, and then determine which perils the policy covers and which it

9    excludes. *Sunbreaker Condo. Ass'n v. Travelers Ins. Co.*, 901 P.2d 1079, 1082 (Wash. Ct. App.

10   1995). All-risk policies like those at issue here "generally allocate risk to the insurer," *Vision One,*

11   *LLC v. Phila. Indem. Ins. Co.*, 276 P.3d 300, 306 (Wash. 2012), because "any peril *that is not*

12   *specifically excluded* in the policy is an insured peril," *Findlay*, 917 P.2d at 121 (emphasis in

13   original). *See also Greenlake Condo. Ass'n v. Allstate Ins. Co.*, No. C14-1860-BJR, 2015 WL

14   11988945, at *6 (W.D. Wash. Dec. 23, 2015) ("Because the Policy is an all-risk policy, it

15   presumptively covers Plaintiff's claims unless Defendant establishes that an exclusion applies.").[5]

16   Policy exclusions are "most strictly construed against the insurer." *Am. Best Food, Inc. v. Alea*

17   *London, Ltd.*, 229 P.3d 693, 697 (Wash. 2010) (cleaned up). And the rule that ambiguities are

18   construed in favor of the insured "applies with added force to exclusionary clauses[.]" *Findlay*,

19   917 P.2d at 119.

20   **D.    Declaratory Relief**

21        As noted above, the Association seeks declaratory relief on four issues. The Court

22   addresses them in turn.

23

24   ---

[5] Named-peril policies, in contrast, "provide coverage only for the specific risks enumerated in the policy and exclude all other risks." *Vision One*, 276 P.3d at 306 (cleaned up).

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 9

1        1.   <u>Coverage for Weather Conditions</u>

The Association first argues that the Country Casualty policies cover weather conditions "for purposes of this case" because the conditions at issue here—rain and wind-driven rain—are not among those expressly excluded. Dkt. No. 27 at 9. Country Casualty does not appear to contest this assertion. *See* Dkt. No. 32 at 2 ("Country does not dispute that 'weather conditions' can be a covered cause of loss.").

As modified by the Washington Changes endorsement, the policies specifically exclude coverage for "[a] weather condition which results in . . . [l]andslide, mudslide or mudflow"; "[m]ine subsidence; earth sinking, rising or shifting (other than sinkhole collapse)"; "[w]ater, as described in Paragraphs A.4.a through A.4.e. of this endorsement";[6] or "[a] weather condition which results in the failure of power communication, water or other utility service supplied to the described premises[.]" Dkt. No. 28-1 at 205–06. All-risk policies cover all perils that are not specifically excluded. *Findlay*, 917 P.2d at 121. And here, the Country Mutual policies "expressly exclude a limited set of specifically identified weather conditions, none of which include the weather conditions at issue in this case (*i.e.*, rain and other precipitation)." *Franssen Condo. Ass'n of Apartment Owners v. Country Mut. Ins. Co.*, No. 2:21-CV-00295-BJR, 2022 WL 10419015, at *8 (W.D. Wash. Oct. 18, 2022); *see also* Dkt. No. 28-1 at 197 (expressly excluding loss of, or damage to, "[t]he *interior* of any building or structure caused by or resulting from rain, . . . whether driven by wind or not, unless . . . [t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain . . . enters" (emphasis added)).

Because there is no genuine dispute that the policies cover those "weather conditions" that are not expressly excluded, the Court grants summary judgment to the Association on this issue.

---

[6] Paragraph A.4.'s water exclusion says nothing about rain or wind-driven rain. *See* Dkt. No. 28-1 at 205.

2.       Coverage for a Combination of Weather Conditions and Negligent Work, Even When Negligent Work Was the Initiating Cause

This is the marquee issue. According to the Association, the all-risk policies cover damage from a combination of covered weather conditions and exclude faulty construction—even if faulty construction was the initiating cause of the damage—because the negligent work exclusion does not contain "initiates a sequence" causation language. Dkt. No. 27 at 9–10. Country Casualty disagrees. It counters that, under the Washington Changes endorsement, all exclusions are subject to the "initiates a sequence" language. Dkt. No. 32 at 2. Country Casualty acknowledges that "there may be some ground for confusion resulting from the way the endorsement is structured," but maintains that the policy language "is not ultimately ambiguous because there is only one reasonable interpretation." *Id.*

The Court first explains three principles of insurance contracts that are necessary to contextualize the parties' dispute: the efficient proximate cause rule, inverse efficient proximate cause rule provisions, and ensuing loss clauses. It then discusses the specific policy provisions at issue. For the reasons discussed in *Franssen*, the Court concludes that the negligent work exclusion, as modified by the Washington Changes endorsement, is ambiguous.

a.       *The Efficient Proximate Cause Rule, Inverse Efficient Proximate Cause Rule Provisions, and Ensuing Loss Clauses*

The efficient proximate cause rule permits coverage "when an insured peril sets other excluded perils into motion which 'in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought.'" *Kish v. Ins. Co. of N. Am.*, 883 P.2d 308, 311 (Wash. 1994) (quoting *Graham v. Pub. Emps. Mut. Ins. Co.*, 656 P.2d 1077, 1081 (Wash. 1983)). "In such a situation, the insured peril is considered the 'proximate cause' of the entire loss and the loss is covered despite the fact that the other perils contributing to the loss were excluded." *Id.*; *accord Safeco Ins. Co. of Am. v. Hirschmann*, 773 P.2d 413, 416 (Wash. 1989) ("If the initial

event, the 'efficient proximate cause,' is a covered peril, then there is coverage under the policy regardless of whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy.").

The Washington Supreme Court has repeatedly warned that insurers "cannot contract around the efficient proximate cause rule, i.e., [they] cannot contract to exclude coverage for excluded perils within a causal chain initially started by a covered peril." *Hill & Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 515 P.3d 525, 536 (Wash. 2022); *see Xia ProBuilders Specialty Ins. Co.*, 400 P.3d 1234, 1241 (Wash. 2017) ("The exclusion cannot eviscerate a covered occurrence merely because an uncovered peril appeared later in the causal chain."). However, and as relevant here, the state's highest court has "left open the possibility that an insurer may draft policy language to deny coverage when an excluded peril initiates an unbroken causal chain." *Vision One*, 276 P.3d at 309; *see Xia*, 400 P.3d at 1241 ("It is perfectly acceptable for insurers to write exclusions that deny coverage when an excluded occurrence initiates the causal chain and is itself either the sole proximate cause or the efficient proximate cause of the loss."). This concept is known as the "inverse efficient proximate cause rule," and policy language implementing it is sometimes referred to as an "inverse EPC-rule provision." *See, e.g.*, *Greenlake*, 2015 WL 11988945, at *10. Such a provision functions to exclude coverage when an exclusion (1) "is the only cause of loss" or (2) "initiates the chain of causation of the loss." *Hill & Stout*, 515 P.3d at 536.

The final preliminary concept is ensuing loss clauses. "While coverage may be excluded when a certain peril causes a loss, a resulting or ensuing loss clause operates to carve out an exception to the policy exclusion." *Vision One*, 276 P.3d at 307 (ensuing loss clauses "limit the scope of what is otherwise excluded under the policy"). Such a clause "says that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the policy

will remain covered. The uncovered event itself, however, is never covered." *McDonald*, 837 P.2d at 1005. The Washington Supreme Court in *Vision One* provided an apt example:

> Suppose a contractor miswires a home's electrical system, resulting in a fire and significant damage to the home. And suppose the homeowner's policy excludes losses caused by faulty workmanship, but the exclusion contains an ensuing loss clause. In this situation, the ensuing loss clause would preserve coverage for damages caused by the fire. But it would not cover losses caused by the miswiring that the policy otherwise excludes. Nor would the ensuing loss clause provide coverage for the cost of correcting the faulty wiring.

276 P.3d at 307. Nonetheless, Washington courts have cautioned that "[e]nsuing loss provisions . . . should not be interpreted to *create* coverage." *Wright v. Safeco Ins. Co. of Am.*, 109 P.3d 1, 7 (Wash. Ct. App. 2004) (emphasis added); *see also Vision One*, 276 P.3d at 307 ("Ensuing loss clauses may not cover losses that are otherwise excluded."). At the end of the day, the "dispositive question" for the Court in analyzing an ensuing loss clause "is whether the loss that ensues from the excluded event is covered or excluded." *Vision One*, 276 P.3d at 307.

### b.    The Policy Provisions and Washington Changes Endorsement

Section B.1 of the Businessowners Coverage Form states that Country Casualty "will not pay for loss or damage caused directly or indirectly" by any of the 10 exclusions enumerated under that section. Dkt. No. 28-1 at 198–200. "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.* at 198. Section B.2 similarly explains that Country Casualty "will not pay for loss or damage caused by or resulting from" any of the 16 exclusions set forth thereunder. Dkt. No. 28-1 at 200–202. Last, and most importantly, is Section B.3:

> **3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> . . .

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

*Id.* at 202.

The Washington Changes endorsement modified the policy in two material respects. First, Section A.2 replaced every introductory paragraph preceding an exclusion or list of exclusions in the Businessowners Coverage Form (including the preamble language in Sections B.1, B.2, and B.3) with a new paragraph:

**2.** In the sections titled Covered Causes of Loss or Exclusions, any introductory paragraph preceding an exclusion or list of exclusions is replaced by the following paragraph, which pertains to application of those exclusions:

We will not pay for loss or damage caused by any of the excluded events described below. Loss or damage will be considered to have been caused by an excluded event if the occurrence of that event:

**a.** Directly and solely results in loss or damage; or

**b.** Initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

*Id.* at 204. This is an inverse EPC-rule provision. And the Washington Supreme Court has expressly approved of identical language. *See Hill & Stout*, 515 P.3d at 536.

As for the second material modification, Section A.6 of the endorsement supplemented the final sentence of the negligent work exclusion with an ensuing loss provision. It also retained the original ensuing loss provision in the Section B.3 preamble:

**6.** Paragraph **B.3. Exclusions** is replaced by the following:

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **a.** through **c.** *But if an excluded cause of loss that is listed in **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.*

. . .

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises. *But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.*

Dkt. No. 28–1 at 205–06 (emphasis added).

     *c.*     *The Businessowners Coverage Form, as Modified by the Washington Changes Endorsement, Is Ambiguous*

Neither party disputes the general function of an inverse EPC-rule provision or ensuing loss clause. Instead, they disagree as to the effect of the former *in this case*, i.e., whether Section A.2 of the Washington Changes endorsement (and its "initiates a sequence" language) controls over the negligent work exclusion's ensuing loss clauses. The dispute boils down to the tension between (1) Section A.2.'s inverse EPC-rule provision (which purports to preclude coverage for all loss when an excluded peril—here, negligent work—sets in motion a sequence of events, even when that sequence includes an otherwise-covered peril or loss—here, water damage from wind-driven rain) and (2) Section B.3's ensuing loss clauses (which purport to cover loss from a covered peril even when an excluded peril initiates the events leading to the loss).

Country Casualty appears to concede that a "difficulty arises" with these two provisions. Dkt. No. 32 at 7. It recognizes that the Washington Changes endorsement preserves Section B.3's preamble while simultaneously purporting to replace the introductory paragraph of every exclusion with an inverse EPC-rule provision. *Id.* at 7–8. The "difficulty" is apparent in a redlined view of the edits made by the Washington Changes endorsement (additions underlined, deletions struck through, and key language bolded for emphasis):

**3. We will not pay for loss or damage caused by any of the excluded events described below. Loss or damage will be considered to have been caused by an excluded event if the occurrence of that event:**
**a. Directly and solely results in loss or damage; or**
**b. Initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.** [*Foregoing text added by § A.2 of Washington Changes; below text (excluding struck through text) inserted by § A.6*]

We will not pay for loss or damage caused by or resulting from any of the following ~~Paragraphs,~~ a. through c. **But if an excluded cause of loss that is listed in Paragraphs a. through c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.**

    a.  Weather Conditions
    ~~Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 8.1. above to produce the loss or damage.~~
    (1) A weather condition which results in:
      (a) Landslide, mudslide or mudflow;
      (b) Mine subsidence; earth sinking, rising or shifting (other than sinkhole collapse);
      (c) Water, as described in Paragraphs A.4.a. through A.4.e. of this endorsement; **But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.**
    (2) A weather condition which results in the failure of power communication, water or other utility service supplied to the described premises, if the failure:
      (a) Originates away from the described premises; or
      (b) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.
    **But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.**

    b.  Acts Or Decisions
    Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body. **But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.**

c. Negligent Work
Faulty, inadequate or defective:
(1) Planning, zoning, development, surveying, siting;
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance;
of part or all of any property on or off the described premises. **But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.**

*Compare* Dkt. No. 28-1 at 202, *with id.* at 204–06. According to Country Casualty, there is no conflict because the Washington Changes endorsement "only '***modifies***' the Businessowners Coverage Form itself" and "does not modify other parts of the Washington Changes endorsement." Dkt. No. 32 at 8. Country Casualty suggests that Section A.6 is not an exception to Section A.2's general "initiates a sequence" language; instead, it is "designed to restore" Section B.3's exclusion, which would otherwise be deleted by Section A.2. *Id.* This is the only "defensible interpretation," says Country Casualty, because otherwise "the net effect of the Washington Changes endorsement would be to nonsensically add a redundant resulting loss exception." *Id.*

This argument is unpersuasive. The Court acknowledges that it must harmonize seemingly conflicting clauses to give effect to all provisions, *Kut Suen Lui*, 375 P.3d at 599, and may not read ambiguity into a contract where it can reasonably be avoided, *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014). But the conflicting clauses are not reconcilable. Both Section A.2 and Section A.6 of the Washington Changes endorsement purport to "replace" the introductory paragraph of the "Exclusions" section (Section B.3) in the Businessowners Coverage Form—but with markedly different and conflicting language, as shown above. *Compare* Dkt. No. 28-1 at 204, *with id.* at 205. And since these two sections do not modify each other—as Country Casualty admits—the Court is left with two competing and incompatible introductory paragraphs. Country Casualty's interpretation asks the Court to ignore that unavoidable ambiguity under the guise of salvaging Section B.3's redundant ensuing loss provisions. Sloppy drafting, though, is not

grounds for judicial revision of policy language. Indeed, Country Casualty agrees that "some confusion could have been eliminated" if Section A.6 "did not reprint the entirety of exclusion B.3 and instead only the modified portions." Dkt. No. 32 at 9.[7] Perhaps a trained legal mind could derive one reasonable interpretation out of this "confusion," but it is highly doubtful that the average insurance purchaser could or would. *See Pub. Util. Dist. No. 1 of Klickitat Cnty. v. Int'l Ins. Co.*, 881 P.2d 1020, 1027 (Wash. 1994) (construing ambiguity in favor of insureds where insurer "could have, but did not, expressly exclude such endorsements from its coverage").

The provisions at issue create more than just innocuous or transient confusion. Under a straightforward and commonsense reading of the Washington Changes endorsement—the way an average insurance purchaser would interpret it—Sections A.2 and A.6 conflict. The facts of this case demonstrate why. "Weather conditions" such as rain that are not expressly excluded in the policies are covered perils. Negligent work (namely, the failure to construct and maintain the building envelope in a more moisture-resistant condition) is an excluded peril. And the parties' experts agree that both rain and negligent work contributed to the water damage. *Compare* Dkt. No. 29-1 at 27 (Evolution report indicating that "intrusion in the form of rainwater events, including wind-driven rain, is the primary cause of the hidden water damage," and characterizing construction defects as "secondary causal factors"), *with* Dkt. No. 28-1 at 76 (Degenkolb report indicating that the "primary source of the infiltrated moisture has been precipitation from normal and expected weather events, including weather events with wind gusts of various magnitudes," but "water breaching the building envelope is not the exclusive result of wind-driven rain; it is the result of breaches existing in the building envelope that allow normal and expected rainfall, wind-

---

[7] Notably, the introductory paragraph in Section A.6 did not merely "reprint" the entirety of Section B.3. Instead, it slightly modifies the original language from the Businessowners Coverage Form, indicating that the "replacement" language in Section A.6 was not a mere oversight but instead was likely the result of inattentive drafting. *Compare* Dkt. No. 28-1 at 202, *with id.* at 205.

driven or not, to enter the wall assembly."), *and id.* at 112–13 (Bramhall opining that water intrusion was not the exclusive result of wind-driven rain). The problem? Pursuant to Section A.2's inverse EPC-rule provision and its "initiates a sequence" language, damage from an otherwise covered peril (e.g., damage from wind-driven rain) will not be covered if that peril is initially brought about by negligent work. At the same time, though, Section A.6's (the new Section B.3's) ensuing loss clauses provide that damage from a covered peril will in fact be covered even when that peril is initially brought about by negligent work. This irreconcilable conflict means that the Businessowners Coverage Form—again, as modified by the Washington Changes endorsement— is ambiguous. And because the ambiguity involves an exclusion, the rule that ambiguities must be construed against the insurer and in favor of the insured "applies with added force[.]" *Findlay*, 917 P.2d at 119.

The Court dealt with the same issue stemming from identical policy language in *Franssen*. There, too, the Court determined that the generally applicable inverse EPC-rule provision conflicted with the ensuing loss provision in the negligent work exclusion's preamble: "Given these seemingly conflicting provisions, it is ambiguous whether the Country Mutual Policies contain language specifically excluding coverage for damage resulting from a chain of causation initiated by negligent work." 2022 WL 10419015, at *10. And because an insurance policy that is fairly susceptible to two different conclusions must be construed in favor of the insured, the Court found that the policies did not exclude coverage for damage resulting from a chain of causation initiated by negligent work. *Id.* Thus, as was the case in *Franssen*, the Court here rules that "if the jury determines that damage resulted from a causal chain that was initiated by negligent work and includes one or more covered perils (*e.g.*, covered 'weather conditions'), then the Country

1   [Casualty] Policies cover that damage." *Id.*[8]

2       Country Mutual urged the Court in *Franssen* to reconsider its ruling. *See Franssen Condo.*

3   *Ass'n of Apartment Owners v. Country Mut. Ins. Co.*, No. 2:21-CV-00295-BJR, 2022 WL

4   16949481, at *2 (W.D. Wash. Nov. 15, 2022). The second time around, however, it made the same

5   argument Country Casualty makes in this case: that the final sentence of the replaced negligent

6   work exclusion "would be redundant if the clause's causation preamble were also to provide

7   coverage for damage caused by a covered peril that resulted from an excluded peril." *Id.*; *see* Dkt.

8   No. 32 at 10 ("[T]he sole effect of the Washington Changes endorsement on the Negligent Work

9   exclusion would be to add [a] second, entirely redundant resulting loss exception for no apparent

10  reason."). The Court made short shrift of this argument. It observed that the endorsement's addition

11  of the final sentence to the negligent work clause did nothing to resolve the ambiguity in Country

12  Mutual's favor: "Country Mutual's proposed construction—in which the negligent work clause

13  begins with an 'initiates a sequence' causation preamble, and ends with 'resulting loss' language—

14  would inject internal conflict into that clause." *Franssen*, 2022 WL 16949481, at *2. Thus, while

15  Country Mutual's reading may have avoided a redundancy in the negligent work clause, "it would

16  also result in conflicting causation language that renders the clause incoherent." *Id.*

17      Country Casualty fails to identify persuasive grounds to depart from *Franssen*. It instead

18  urges the Court to "take an independent view of this issue" instead of relying on "non-binding

19  authority or materials from other cases." Dkt. No. 32 at 4. After independently analyzing the issue,

20  the Court reaches the same conclusion as in *Franssen*.

21

22  _____

    [8] This is not to suggest that negligent work is the only possible efficient proximate cause that the jury could find. The

23  parties' experts offer competing views as to the primary cause of the water damage. Thus, whether wind-driven rain
    or negligent work initiated the sequence of events leading to the loss is a factual determination for the jury. *See Hill*

24  *& Stout*, 515 P.3d at 535 ("The determination of the efficient proximate cause of loss is a question of fact for the fact
    finder."); *Graham*, 656 P.2d at 1081 ("[I]t is only when the facts are undisputed and the inferences therefrom are plain
    and incapable of reasonable doubt or difference of opinion that it may be a question of law for the court.").

3.     Other Exclusions

The Association contends that none of following exclusions bar coverage in this case: wear and tear (Section B.2.l(1)); rust or other corrosion, decay, or deterioration (Section B.2.l(2)); continuous or repeated seepage or leakage of water (Section B.2.p); and "fungi," wet rot or dry rot (Section B.1.i). Dkt. No. 27 at 10.

Country Casualty puts up the biggest fight with respect to the 14-day seepage exclusion. As its title suggests, this exclusion bars coverage for "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." Dkt. No. 28-1 at 202. Country Casualty believes that the evidence "supports the inference that water intrusion has been occurring repeatedly for years" and "the simple presence of moisture for extended periods is sufficient to satisfy the exclusion." Dkt. No. 32 at 10. It points to the Degenkolb report, in which Bramhall opines that poor construction and maintenance have "allowed periodic moisture contact and/or sustained elevated moisture levels within the building assemblies"—shortcomings that, in turn, "caused localized deterioration of the [gypsum board], fungal decay of wood framing materials, and corrosion to fasteners and structural hardware at multiple locations." Dkt. No. 28-1 at 78; *see* Dkt. No. 32 at 10.

The Court disagrees with Country Casualty's interpretation of the policy. As an initial matter, Bramhall testified that he did not identify any periods of "water intrusion" that lasted 14 days or longer. *See* Dkt. No. 28-1 at 87. And in Eggert's view, it would "be wrong to assume that the damage was caused by continuous moisture exposure" occurring over a period of 14 days or more. Dkt. No. 36 at 2.[9] But Country Casualty's application of this exclusion fails on a more

---

[9] *See also* Dkt. No. 29-1 at 33 (enumerating weather events with precipitation and wind sufficient (in Evolution's opinion) to allow water damage to occur at the Ridge at Riverview each year from 2000 to 2019; although Evolution notes that the specific dates of each event are listed in "Appendix A," this Appendix is not included in the record).

fundamental level. To the extent it suggests that rain (wind-driven or otherwise) can be characterized and thus excluded as a 14-day seepage or exposure to moisture, courts have repeatedly rejected such an approach. The policies here—as is typically the case—treat weather conditions as a distinct peril. *See, e.g.*, *Sunbreaker*, 901 P.2d at 1084 (because "the seepage exclusion relates to a long term event" and "is not commonsensically associated with a weather condition," wind-driven rain is a peril distinct from continuous or repeated seepage occurring over a period of 14 days or more); *Eagle Harbour Condo. Ass'n v. Allstate Ins. Co.*, No. C15-5312-RBL, 2017 WL 1316936, at *4 (W.D. Wash. Apr. 10, 2017) ("Under Eagle West's policy, 'repeated seepage of water' does not necessarily include decades of storm events. . . . Rain, not acting with the listed exclusions, is therefore covered, so long as it does not leak into the property for over 14 days in duration."); *Franssen*, 2022 WL 10419015, at *8 ("Plaintiff clearly claims, as did the plaintiffs in *Sunbreaker* and *Eagle Harbour*, that the damage was caused by temporary precipitation. That type of peril is distinct from, and does not constitute, water seepage or leakage occurring 'over a period of 14 days or more.'").

Even if the 14-day seepage exclusion encompassed the "sustained elevated moisture levels" Bramhall noted, the water damage was not "caused by" those moisture levels because they did not directly and solely result in the damage. Nor did those moisture levels initiate a sequence of events leading to the damage. *See* Dkt. No. 28-1 at 204 (loss or damage is considered to have been "caused by" an excluded event if the occurrence of the event "[d]irectly and solely results in loss or damage" or "[i]nitiates a sequence of events that results in loss or damage[.]"). According to the Degenkolb report, negligent work was the initiating cause of the water damage. *See* Dkt. No. 28-1 at 77 ("Normal and expected precipitation was allowed to enter the building and contact moisture sensitive building materials on multiple occasions as a result of the failure to construct and maintain the building envelope in a more moisture-resistant condition."); *id.* at 78 ("The

inadequate construction and maintenance . . . has allowed periodic moisture contact and/or sustained elevated moisture levels within the building assemblies[.]"). Despite Degenkolb's written report, Bramhall appeared unwilling to confirm whether faulty or inadequate construction was the initiating cause of the water damage. *Compare* Dkt. No. 28-1 at 86 (Q: "Was faulty construction the initiating cause of the damage at the Ridge at Riverview?" A: "I don't know."), *with id.* at 108 ("Well, the cause is not from the rain. The cause is exposure to normal and expected rainwater as a result of openings and paths . . . in the cladding. It's the . . . presence of the opening and the breaches in the . . . cladding that's the cause."). In any event, though, a combination of faulty construction, inadequate maintenance, and rain—regardless of which peril is the efficient proximate cause—led to sustained moisture levels in the building envelope, which in turn resulted in the claimed water damage. Nothing in the Degenkolb report or Bramhall's testimony indicates that a prolonged (14 days or more) presence of moisture either (1) was the direct and sole cause of the water damage, or (2) initiated a sequence of events resulting in the water damage. Again, a loss is "caused by" an excluded peril only under those two circumstances. The 14-day seepage exclusion therefore does not apply here.

The remaining exclusions fail for the same reason. Country Casualty contends that wear and tear, rust, corrosion, decay, deterioration, fungi, and rot "are all clearly present at the buildings[.]" Dkt. No. 32 at 11. According to Country Casualty, "it is up to the trier of fact to determine whether, for example, a failed sealant is best described as inadequate maintenance or 'wear and tear' of the sealant materials." *Id.* And, relying on the negligent work exclusion's ensuing loss provision, it claims that "such causes of loss are relevant whether or not they were the initiating cause." *Id.* To be sure, Bramhall characterized the water damage as "corrosion," "deterioration" and "rot," but the cause of those conditions was "repeated exposure to liquid water." *See, e.g.*, Dkt. No. 28-1 at 87, 89–90. Country Casualty has not shown—indeed, it does

not even earnestly argue—that rust, corrosion, decay, deterioration, fungi, or rot either "[d]irectly and solely result[ed] in" the claimed water damage or "[i]nitiate[d] a sequence of events that resulted in" the water damage. *Id.* at 204. Again, Bramhall opined that normal precipitation entered the building and contacted moisture-sensitive building materials on multiple occasions "as a result of the failure to construct and maintain the building envelope in a more moisture-resistant condition." *Id.* at 77. The inadequate construction and maintenance thus "allowed periodic moisture and/or sustained elevated moisture levels within the building assemblies," which *then* caused "localized deterioration of the [gypsum board], fungal decay of wood framing materials, and corrosion to fasteners and structural hardware at multiple locations." *Id.* at 78. Country Casualty likewise fails to show that wear and tear is solely and directly responsible for, or initiated a sequence of events leading to, the water damage at issue. In fact, Bramhall opined that he did not recall observing any wear and tear, or damage caused by wear and tear. *See id.* at 90.

One final observation deserves mention. It is true that the excluded perils cited above "could conceivably encompass water intrusion damage to a building's exterior." *Canyon Ests. Condo. Ass'n v. Atain Specialty Ins. Co.*, No. 2:18-CV-01761-RAJ, 2021 WL 1208581, at *4 (W.D. Wash. Mar. 31, 2021). The issue, however, "turns on whether the Court construes the exclusion[s] broadly (in favor of the insurer) or narrowly (against the insurer)," and "Washington law is resolute: exclusions must be construed narrowly against [the insurer]." *Id.* (citing *Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1134 (9th Cir. 2002)). The exclusions at issue therefore do not bar coverage for the claimed loss.

4.  Country Casualty's Liability in the Event the Jury Finds That Damage Occurred from the Combination of Weather Conditions and Negligent Work

The Association last seeks a declaration that, if the jury finds that damage occurred from the combination of weather conditions and negligent work, then Country Casualty is jointly and

severally liable for all incremental water damage because "[s]ome new damage happened" during the policy periods. Dkt. No. 27 at 11; *see* Dkt. No. 34 at 9.[10] In contrast, Country Casualty insists that there is a triable issue of fact as to whether any "new" damage commenced during the policy periods. *See* Dkt. No. 32 at 11–13. The Court disagrees.

     *a. Commencing Condition*

   Each policy limits coverage to "loss or damage commencing . . . [d]uring the policy period[.]" Dkt. No. 33 at 6. Where, as here, the policies do not define "commencing," that term is ambiguous and must be construed against the insurer "to mean that the loss or damage 'commenced' on each 'identifiable instance of new damage or loss' in the policy period." *Gold Creek Condo.-Phase I Ass'n of Apartments Owners v. State Farm Fire & Cas. Co.*, No. 20-5690-RJB, 2022 WL 2398395, at *7 (W.D. Wash. July 1, 2022) (quoting *Sunwood Condo. Ass'n v. Travelers Cas. Ins. Co. of Am.*, No. C16-1012-JCC, 2017 WL 5499809, at *5 (W.D. Wash. Nov. 16, 2017)); *Eagle Harbour*, 2017 WL 1316936, at *6; *see also Franssen*, 2022 WL 10419015, at *6 ("Washington courts have held, in similar cases involving damage caused by water intrusion into buildings' exteriors, that ['commencing'] may be interpreted to encompass each new 'progressive and incremental' damage within a series [of] weather-related damage."). Importantly, "'loss' and 'damage' are distinct terms, and damage could commence during the policy period,

---

[10] The Association's reply brief contains 11 footnotes, some of which entail substantive discussion. *See* Dkt. No. 34 at 5 n.6, 6 n.8, 10 n.11. The Court's Standing Order for All Civil Cases directs litigants to reserve footnotes "for explanatory and supplemental information" because "[s]ubstantive information and discussion *must* appear in the body of the brief[.]" Standing Order, § I.B.1(a) (emphasis added). Briefs that fail to comply with the Court's Standing Order "may be summarily denied or stricken." *Id.* In this case, the Court strikes the noncompliant footnotes. Dkt. No. 34 at 5 n.6, 6 n.8, 10 n.11. The court also disregards the unpublished Washington state cases to which the Association cites. *See, e.g.*, Dkt. No. 34 at 12; *see also Cont'l W. Ins. Co. v. Costco Wholesale Corp.*, No. C10-1987 RAJ, 2011 WL 3583226, at *4 (W.D. Wash. Aug. 15, 2011) ("Because Washington courts have made the judgment that 'unpublished' state court decisions should not shape their decisions, this court follows their lead."); *Yousoufian v. Off. of Ron Sims*, 229 P.3d 735, 749 (Wash. 2010) (striking portions of briefs citing to unpublished superior court decisions). The Court additionally observes that the Association has used footnotes for lengthy block quotes in an apparent attempt to circumvent page limits. *See* Dkt. No. 34 at 3 n.2, 4 n.4, 6 n.7. Future attempts to circumvent applicable rules will result in sanctions.

resulting in a cumulative loss." *Sunwood Condo. Ass'n*, 2017 WL 5499809, at *7. The Association must therefore identify instances of new damage during the policy periods to trigger coverage. *Gold Creek*, 2022 WL 2398395, at *7.

Whether an insured can prove instances of new damage or loss during the policy period is typically a question of fact for the jury. *See, e.g.*, *Eagle Harbour*, 2017 WL 1316936, at *6 ("It is for the jury to decide whether each storm event operated like a rock hitting and cracking an already cracked windshield, or whether they had no new effect, and instead the water damage operated like a single crack on a windshield that simply elongated over time."). Here, however, the expert reports and deposition testimony reveal no genuine dispute as to whether new damage occurred between November 2017 and November 2020. Eggert opines in his July 2020 Evolution report that "[h]idden damage at [the] Ridge at Riverview has occurred incrementally and progressively *each year* from 2000." Dkt. No. 29-1 at 27 (emphasis added). Bramhall similarly found it "likely" that water intrusion occurred during the policy periods. Dkt. No. 28-1 at 95–96; *see also id.* at 104 (agreeing that there has "probably been water intrusion occurring . . . every year since original construction"). Indeed, he went a step further and conceded that water damage did in fact occur during the relevant timeframe. *See id.* at 96 (Q: "And, in fact, you know there was [water intrusion], because Degenkolb measured wet sheathing in June 2020; right?" A: "Yes"); *id.* at 104 ("water that gets in there will contribute to the damage"); *id.* at 106 ("I would say that a portion of the damage that's observed occurred within that two and a half years, yeah."). Thus, no genuine dispute exists as to whether "new" damage occurred during the policy periods. *See Greenlake*, 2015 WL 11988945, at *13 (finding no genuine issue of fact as to whether some of the damage occurred during the policy period where both experts opined that damage "likely" began "during the period that Defendant insured Plaintiff").

1

2

3

*b.     Allocation and Liability*

Under Washington law, "[o]nce coverage is triggered in one or more policy periods, those policies provide full coverage for all continuing damage, without any allocation between insurer and insured." *Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998). This is known as the "continuous trigger" rule, which treats progressive or incremental damage as a single, continuing "occurrence" for liability purposes. *Franssen*, 2022 WL 10419015, at *10. The Washington Supreme Court has accordingly warned that, if an insurer wishes to limit its liability to a pro rata allocation of damages, it must include such language in the policy. *B & L Trucking*, 951 P.2d at 256. None of the Country Casualty policies include language to that effect. Moreover, insurers who provide coverage during the period in which damage occurs are jointly and severally liable for the total damage. *Greenlake*, 2015 WL 11988945, at *12; *accord Eagle Harbour*, 2017 WL 1316936, at *7 ("Each insurer of a risk during a time of ongoing damage has a joint and several obligation to provide coverage for that damage.").

For the foregoing reasons, if a jury finds that damage occurred from the combination of weather conditions and negligent work, Country Casualty is liable—jointly and severally with any other insurers who covered such damage—for all the incremental hidden weather damage.

**E.     Affirmative Defenses**

As already noted, Country Casualty asserts six affirmative defenses to coverage. The Association urges the Court to dismiss all of them. Because Country Casualty bears the burden of proof on its affirmative defenses at trial, the Association must show that Country Casualty does not have enough evidence of an essential element of its affirmative defenses to carry its burden at trial. *Nissan Fire & Marine*, 210 F.3d at 1102; *see also Celotex*, 477 U.S. at 322–23. To the extent the Association makes such a showing, Country Casualty must present specific facts demonstrating that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587.

1

       1.    <u>Suit Limitation Condition</u>

2

      As relevant here, the policies bar any lawsuit against Country Casualty unless the action

3

"is brought within two years after the date on which the direct physical loss or damage occurred."

4

Dkt. No. 28-1 at 206. The Association argues that Country Casualty "has no evidence to support

5

its allegation of failure to comply with the two-year deadline to file suit[.]" Dkt. No. 27 at 12. It

6

points to the parties' tolling agreement and notes that "this lawsuit is treated as if it had been filed

7

on March 27, 2020, within a few days of discovery of the hidden damage." *Id.* Country Casualty

8

agrees the suit clause is inapplicable "[t]o the extent that the Association demonstrates that

9

otherwise covered damage commenced during a Country policy period [less] than two years before

10

the applicable tolling agreement[.]" Dkt. No. 32 at 13. This affirmative defense is accordingly

11

dismissed.

12

       2.    <u>Exclusions</u>

13

      Country Casualty "reserve[d] its right to rely on all terms of the policies, including, but not

14

limited to, the limitation for damage to the interior of any building or structure caused by the rain,"

15

as well as "the exclusions for collapse, repeated seepage or leakage of water, wear and tear,

16

corrosion, decay, deterioration, settling, cracking, shrinking, or expansion, [and] faulty or

17

inadequate construction or maintenance." Dkt. No. 19 at 5. For the reasons discussed in Section

18

II.D.3, *supra*, this affirmative defense is dismissed. To the extent the Court's previous discussion

19

does not touch on one or more of these exclusions, Country Casualty has failed to demonstrate a

20

triable issue of fact as to their applicability. *See Matsushita*, 475 U.S. at 587; *Greenlake*, 2015 WL

21

11988945, at *6 ("Because the Policy is an all-risk policy, it presumptively covers Plaintiff's

22

claims unless Defendant establishes that an exclusion applies."); *McDonald*, 837 P.2d at 1004 ("To

23

avoid coverage, the insurer must then show the loss is excluded by specific policy language.").

24

3.      Fortuity and the "Known Loss" Doctrine

In Washington, the fortuity principle is variously referred to as the "known risk" doctrine, "known loss" doctrine, and the "loss-in-progress" doctrine. *See Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 998 P.2d 856, 878 (Wash. 2000); *Hillhaven Properties Ltd. v. Sellen Constr. Co., Inc.*, 948 P.2d 796, 799 (Wash. 1997). "The known risk defense is premised on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased." *Pub. Util. Dist. No. 1*, 881 P.2d at 1030. The fortuity principle "is sometimes called the unnamed exclusion" because an all-risk policy "never provides coverage for nonfortuitous events, even though nonfortuitous events are not named exclusions in the policy." *Aluminum Co.*, 998 P.2d at 879; *see also Eagle Harbour*, 2017 WL 1316936, at *5 ("An all-risk policy covers all losses except those that are expressly excluded and those an insured subjectively knew would occur—non-fortuitous losses.").

General knowledge that some loss may occur in the future is insufficient to invoke the known loss doctrine; rather, the insurer must prove that the insured knew there was a "substantial probability" of a loss. *Pub. Util. Dist. No. 1*, 881 P.2d at 1030–31; *accord Hillhaven*, 948 P.2d at 799; *MKB Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 838 (W.D. Wash. 2014). The fortuity inquiry "should look to, among other things, whether a particular loss was certain to occur, the parties' perception of risk at the time the policy issued, and whether the loss could reasonably have been foreseen." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 815 (9th Cir. 2019). The focus is not on the fortuity of the *cause* of the loss, but on whether the loss itself was fortuitous. *Id.*; *see, e.g.*, *Babai v. Allstate Ins. Co.*, No. C12-1518-JCC, 2014 WL 12029279, at *2 (W.D. Wash. Oct. 8, 2014) ("[T]he proper inquiry is not whether rain is unexpected, but whether the loss is unexpected.").

The Association contends that the water damage was fortuitous because it was "hidden

behind siding and soffits" and therefore "unknown and unexpected prior to the intrusive investigations." Dkt. No. 27 at 13. Moreover, Country Casualty's claim file "contains no evidence to support its boilerplate speculation that the Association might have known about the claimed damage before it purchased insurance." *Id.* Country Casualty does not address these assertions— or fortuity generally—anywhere in its opposition. *See* Dkt. No. 32 at 1–13. This dooms any fortuity-based affirmative defense. *Matsushita*, 475 U.S. at 587.

### 4.   Commencement Condition

For the reasons discussed in Section II.D.4.a, *supra*, the Association has established that at least some new damage occurred during the policy periods (November 2017 to November 2020). Accordingly, this affirmative defense is dismissed.

### 5.   Failure to Mitigate Damages

"'The doctrine of mitigation of damages,' which generally applies in both contract and tort cases, 'prevents recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed.'" *Pub. Util. Dist. No. 2 of Pac. Cnty. v. Comcast of Wash. IV, Inc.*, 336 P.3d 65, 91 (Wash. Ct. App. 2014) (quoting *Bernsen v. Big Bend Elec. Coop., Inc.*, 842 P.2d 1047, 1051 (Wash. Ct. App. 1993)); *see also Cobb v. Snohomish Cnty.*, 935 P.2d 1384, 1389 (Wash. Ct. App. 1997) (the injured party has a duty to use reasonable means to avoid or minimize the damages). "Courts allow a wide latitude of discretion to the person who, by another's wrong, has been forced into a predicament where he is faced with a probability of injury or loss." *Jaeger v. Cleaver Constr., Inc.*, 201 P.3d 1028, 1037 (Wash. Ct. App. 2009). A plaintiff has no duty to mitigate when the defendant has an equal opportunity to do so. *Walker v. Transamerica Title Ins. Co.*, 828 P.2d 621, 625 (Wash. Ct. App. 1992). The party whose wrongful conduct caused the damages has the burden of proving failure to mitigate. *Pub. Util. Dist. No. 2*, 336 P.3d at 91–92; *Cobb*, 935 P.2d at 1389.

1    The Association contends that "as soon as the Association discovered the damage it

2    tendered a claim," and "Country [Casualty] is the one who unreasonably delayed its investigation

3    and coverage decision" for over a year. Dkt. No. 27 at 14. As the Association points out, Country

4    Casualty does not explain what it believes could or should reasonably have been done to mitigate

5    damages. *Id.*; *see also* Dkt. No. 19 at 5; Dkt. No. 32. In its response to the Association's motion,

6    Country Casualty fails to address the Association's arguments or otherwise identify reasonable

7    efforts the Association should have taken—but did not take—to mitigate damages. *See generally*

8    Dkt. No. 32. And the record demonstrates that counsel for the Association tendered a formal notice

9    of claim to Country Casualty just nine days after receiving Eggert's March 2020 report on the

10   water damage. Dkt. No. 31 at 2. Country Casualty has not established a genuine issue for trial

11   regarding failure to mitigate damages. The Court therefore dismisses this affirmative defense.

12        6.    Policy Deductible

13       The policies state that Country Casualty "will not pay for loss or damage in any one

14   occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations."

15   Dkt. No. 35-1 at 10. The deductible is $5,000. *Id.* at 9. The Association tendered a repair estimate

16   from McLeod Construction totaling $3,197,673.86, an amount that was subsequently revised and

17   increased to $3,412,266. Dkt. No. 28-1 at 190–91. The record also contains a detailed scope of

18   repair from Eggert's July 2020 report. *See* Dkt. No. 29-1 at 93–103. The Association argues that

19   the deductible is met because "the claimed damage will be at least $3.5 million." Dkt. No. 27 at

20   14; *see also* Dkt. No. 29 at 4.

21       Country Casualty responds that the deductible may not be met here because there are

22   "multiple defects . . . at multiple locations," and they are not necessarily subject to just one

23   deductible. Dkt. No. 32 at 13. In reply, the Association counters that such an argument "squarely

24   contradicts Washington law," which treats incremental and progressive damage from weather-

related water intrusion as a single occurrence. Dkt. No. 34 at 10. Thus, the argument goes, the damage here should be treated as a single occurrence, and in that case the cost of repairs easily exceeds the $5,000 deductible. *Id.* But the *number* of relevant occurrences for the purpose of interpreting the per occurrence deductible is different from the question of *when* the relevant occurrence happens for the purpose of determining if there is coverage at all.

*Sunwood Condominium Association* contained a deductible provision identical to the one at issue here. *See* 2017 WL 5499809, at *7. And in that case, the Court rejected the same argument the Association now advances: "The Association argues it meets [the insurer]'s deductible requirement because cumulative damage from different rain events should be treated as one 'occurrence.'" *Id.* The Court explained that this argument is "based on case law involving joint and several liability," and it "decline[d] to extend its liability analysis to provide a definition for the undefined term 'occurrence' in [the] deductible provision." *Id.* So too, here. However, the Court follows *Sunwood*'s lead in concluding that, even under Country Casualty's definition of "occurrence"—a separate, single event or incident—"a jury could still find that [t]he Association suffered progressive damage cumulating in one 'event' of 'loss.'" *Id.* "Given its plain meaning most favorable to the insured, 'loss' means 'the amount of a claim on an insurer by the insured.'" *Id.* If this is the case, the Association need only show that the resulting loss exceeds $5,000. *Id.* Country Casualty does not take issue with the McLeod Construction estimate.

Because the Association has failed to show that Country Casualty does not have enough evidence of an essential element of this affirmative defense to carry its burden at trial, the Court finds a triable issue of fact as to whether the deductible has been met. The Association's motion is denied with respect to this affirmative defense.

### III.   CONCLUSION

In accordance with the preceding analysis, the Court GRANTS IN PART and DENIES IN

1    PART the Association's Motion for Summary Judgment. Dkt. No. 27.

2            Dated this 3rd day of January, 2023.

3

4                                                    Lauren King
                                                     United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24